1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   EDWARD KA'ANOI,

11            Plaintiff,                    No. CIV S-07-2722 JKS EFB PS[1]

12        vs.

13   DRMS DIRECTOR
     LT. GEN. ROBERT T. DAIL,

14
              Defendant.                    FINDINGS AND RECOMMENDATIONS
15
     _____/
16

17        This action, filed pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and

18   the Rehabilitation Act, proceeds before the undersigned pursuant to Eastern District of California

19   Local Rule ("Local Rule") 72-302(c)(21) and 28 U.S.C. § 636(b)(1).  Presently before the court

20   is defendant's motion for summary judgment, which, upon completion of the briefing, was taken

21   under submission pursuant to Local Rule 78-230(h).  Having reviewed all submitted papers, the

22   undersigned recommends that defendant's motion be granted.

23   ////

24   ////

25   _____

26        [1]  This action is related to *Ka'anoi v. Kerr et al.*, Civ. S-06-2730 JKS EFB PS, which was
     dismissed on January 15, 2008.  Judgment was entered that same date.

                                         1

1  I.    BACKGROUND

2         Plaintiff initiated this action on December 17, 2007, alleging claims against Lt. Gen.

3  Robert T. Dail, the director of the Defense Reutilization and Marketing Service ("DRMS"), a

4  federal agency located at Travis Air Force Base ("Travis AFB"), California that disposes of

5  excess property received from the military services.[2]  Plaintiff alleges, pursuant to Title VII and

6  the Rehabilitation Act, that he was discriminated and retaliated against on the basis of a physical

7  handicap (back and spinal injury) and his national origin (Hawaiian).[3]  Dckt. No. 1, Compl.

8         On June 26, 2009, defendant filed a motion for summary judgment on plaintiff's claims,

9  and gave notice to plaintiff regarding the standards and requirements for opposing a motion for

10  summary judgment.  Dckt. No. 33.  After being granted a relatively lengthy extension, plaintiff

11  filed a timely opposition to the motion on September 28, 2009, and filed an additional untimely

12  opposition to the motion on October 1, 2009.[4]  Dckt. Nos. 41, 42.  Defendant filed a reply brief

13  on October 7, 2009.  Dckt. No. 43.  On October 15, 2009, after the court had already taken the

14  matter under submission, plaintiff filed a further declaration.  Dckt. No. 46.

15  ////

16  ////

17  ////

18

19         [2] Plaintiff also named as defendants DRMS employees Clifford R. Kerr and Roger
    Waring, and also alleged certain "constitutional claims" (i.e., claims regarding alleged violations
20  of his civil rights).  However, on September 10, 2008, this court dismissed defendants Kerr and
    Waring, as well as plaintiff's constitutional claims.  Dckt. Nos. 23, 26.

21         [3] Plaintiff also appears to raise for the first time throughout his opposition an issue
22  pertaining to his privacy rights.  Dckt. No. 41-2, at 15-16, 17, 18, 26, 29, 35.  However, because
    plaintiff never asserted a privacy claim prior to his opposition to defendant's motion for
23  summary judgment, such a claim is not properly before the Court.  *Coleman v. Quaker Oats, Co.*,
    232 F.3d 1271,1291-92 (9th Cir. 2000).

24         [4] The October 1, 2009 opposition contains duplicate copies of three of the documents
25  contained in plaintiff's September 28, 2009 opposition and adds one new 4-page document
    entitled "Plaintiff's Follow up of Argument Clarification for Objection to Summary Judgment by
26  Defendant."  Dckt. No. 42-3.  Although this document was not timely filed, it was nonetheless
    considered by the court.

1   II.   <u>FACTS</u>

2       In 1986, plaintiff, whose national origin is Hawaiian, began working for DRMS at Travis

3   AFB as a materials sorter and forklift operator.  Pl.'s Deposition ("Dep."), at 129, 12.  On or

4   about July 26, 2004, plaintiff was injured while at work.  Compl. at 1, 3; Dep. at 44-45; Dep.,

5   Ex. 2 at 12; Def.'s Ex. 1.  On August 6, 2004, plaintiff was seen by Dr. Bryan Holcomb, a

6   worker's compensation doctor, who diagnosed plaintiff with "muscle strain L/S spine" and

7   indicated that plaintiff could return to work on August 6, 2004, with modified work limitations,

8   including a 20 pound weight restriction for lifting, pushing, and pulling; minimal bending; and

9   an opportunity to alternate sitting and standing every 20 to 30 minutes.  Dep. at 47-48; Dep., Ex.

10  2 at 15; Def.'s Ex. 3.  The report also stated: "No work if modified work not available."  Dep.,

11  Ex. 2 at 15; Def.'s Ex. 3.  Plaintiff turned the medical report in to his supervisors.  Dep. at 48-49;

12  Def.'s Ex. 7.

13      After the injury, plaintiff continued to work in the industrial yard until he was relieved

14  from work on October 27, 2004, but modified the way he functioned in the position and

15  struggled to get the work done.  Dep. at 60, 67-70.  For example, he would "use a lot of arm

16  work to get off and on a forklift" and would do everything "gingerly" and in moderation.  *Id.* at

17  68.  He also limited his time on the forklift.  *Id.* at 125.  However, plaintiff did not formally or

18  informally request an accommodation.  *Id.* at 68-71.

19      On various occasions in August, September, and October 2004, plaintiff was seen by Dr.

20  Holcomb, was diagnosed as having a "lumbar sprain," and was told he could return to work with

21  similar work limitations, but also should spend "minimal time on [a] fork-lift" and should "avoid

22  exposure to bouncing/jarring."  Dep. at 47-55; Dep., Ex. 2 at 15-20; Def.'s Exs. 7, 9, 11, 13.

23  Plaintiff turned these medical reports in to his supervisors.  Def.'s Exs. 7, 9, 11, 13.

24      Plaintiff received an email on October 12, 2004, from Clifford R. (Ralph) Kerr, the

25  DRMS area manager, expressing concern and suspicion as to whether plaintiff's injury resulted

26  from his job at DRMS or from his additional, part-time employment.  Dep. at 57-58; Dep., Ex 4;

Def.'s Ex. 16.  Plaintiff's site supervisor, Roger Waring, asked plaintiff on October 20, 2004 about his use of a worker's comp doctor rather than his private medical insurance after his on-the-job injury.  Dep. at 29; Dep., Ex. 1 at 42-43, 50; Dckt. No. 33-3, Waring Aff. ¶ 12.d.  On October 26, 2004, plaintiff received an email from Kerr requesting clarification regarding the nature of plaintiff's injury, when and where it occurred, and plaintiff's current health status.  Dep., Ex. 3; Def.'s Ex. 17.  The next day, on October 27, 2004, plaintiff was seen by his primary care physician, Dr. David Woodhouse, and was relieved from work from October 27, 2004 to November 27, 2004 due to stress and depression.  Dep. at 56-57; Dep., Ex. 2 at 21; Def.'s Ex. 19.  Plaintiff was seen by Dr. Santi Rao, on November 1, 2004, and was diagnosed with chronic pain, sprain and strain, and lumbar, and was told he could return to work with certain work limitations.  Dep. at 72-73; Dep., Ex. 2 at 24; Def.'s Ex. 20.

Plaintiff contacted an EEO counselor on November 4, 2004.  Dep. at 24; Dep., Ex. 1 at 1. He told the counselor that his supervisor was discriminating against him by referring to him as "Eddy K" rather than by his last name and that management was "harassing him and discriminating against him by their treatment of him and by sending in nasty letters."  *Id.* at 1-2. However, he requested that the EEO office not start a informal investigation process until January 31, 2005 because he was off work and was busy with doctor's appointments.  *Id.* at 1.

Kerr telephoned plaintiff at home on November 18, 2004.  Def.'s Ex. 21; Kerr Aff. ¶ 13.c.  According to a declaration of plaintiff's wife, Kerr told her that plaintiff needed to send in another doctor's note or he would be charged with AWOL (absence without leave) and would not get paid.  Def.'s Ex. 21.  According to defendant, Kerr only called plaintiff to inform him of the agency's requirements for supporting sick leave.  Def.'s Ex. 21; Kerr Aff. ¶ 13.c.

Also on November 18, 2004, Dr. Woodhouse relieved plaintiff from work from November 18, 2004 to January 30, 2005 due to stress and severe depression.  Dep. at 72; Dep., Ex. 2 at 25-26; Def.'s Ex. 21.

////

On November 22, 2004, plaintiff was seen by Dr. Holcomb, who said that plaintiff should remain off work until after Dr. Rao's next evaluation.  Dep. at 76-77; Dep., Ex. 2 at 32.  On November 29, 2004, Dr. Rao recommended that plaintiff see his treating physician for consideration of a final disability status and further work restrictions and vocational rehabilitation.  Dep. at 77; Dep., Ex. 2 at 34.

On December 22, 2004, Kerr sent a letter to plaintiff requesting substantiation of plaintiff's sick leave after plaintiff's supervisor saw an article and a picture in the local newspaper indicating that plaintiff had provided entertainment at a holiday pageant during a time when he was relieved from work due to his disability.  Dep., Ex. 1 at 21, Ex. 2 at 23; Def.'s Ex. 25; Kerr Aff. ¶ 13.f.

When plaintiff was seen by a doctor in January 2005, plaintiff had not improved, so it was recommended that plaintiff remain off work until after a vocational rehabilitation evaluation. His work limitations were stated as "[p]ermanent and stationary," with the notation that plaintiff "needs vocational rehab for different job," and should "follow up with [primary care physician]." Dep. at 83; Dep., Ex. 2 at 39.  Also in January 2005, a doctor stated that plaintiff's "permanent disability as a result of the injury . . . is likely to preclude [him] from returning to work at the pre-injury occupation," and that plaintiff is "currently physically able to participate in vocational rehabilitation services" with certain physical limitations.  Dep. at 80; Dep., Ex. 2 at 35.

On February 11, 2005, plaintiff was offered a sedentary, non-supervisory office automation job consistent with his physical restrictions, in which plaintiff would maintain his same pay grade and title.  Dep. at 84; Dep., Ex. 2 at 41-44.  Plaintiff accepted the offer on February 12, 2005.  Dep. at 84; Dep., Ex. 2 at 45.  When he reported to DRMS at Travis AFB on February 14, 2005, he was instructed to go to DRMS in Stockton.  While in Stockton, he was given the impression that Stockton was the site of his new job, and in a state of confusion, he drove back to Travis AFB.  An amended job offer dated February 16, 2005 was sent to him which clarified that plaintiff's duties were to be performed at Travis AFB.  Plaintiff accepted the

amended offer on February 17, 2005.  Dep. at 85-89; Dep., Ex. 2 at 46-49.

On or about March 11, 2005, plaintiff was given a Notice of a Proposed Reprimand based on the following alleged misconduct: he was absent on February 15-16, 2005, without first requesting leave and was charged 16 hours AWOL; he was late for work on February 22, 2005; and, while he was given leave for February 24-25, 2005 to attend his father-in-law's funeral in Missouri, he was absent February 28, 2005 to March 2, 2005, without pre-approval.  Dep. at 93-94; Dep., Ex. 2 at 52-53; Def.'s Ex. 62.

Plaintiff filed an EEOC complaint on March 15, 2005.  Dep. at 27.  He raised in that complaint the following claims of discrimination and reprisal: (1) on September 21, 2004, plaintiff was denied light duty by his supervisor based on his spinal injury; (2) on October 12, 2004, plaintiff's supervisor asked him for information about his on-the-job injury; (3) on November 18, 2004, plaintiff's supervisor called his home and threatened plaintiff with AWOL if he did not send in a doctor's note allowing him to stay home; (4) on October 20, 2004, plaintiff was verbally attacked by his supervisor about why he did not use his private medical insurance after his on-the-job injury; (5) on October 26, 2004, plaintiff's supervisor sent plaintiff an email which mocked his spinal injury; (6) on December 22, 2004, plaintiff received a harassing letter from his supervisor threatening to deny his absences, to put him on AWOL, and to subject him to disciplinary action; (7) on February 13, 2005, plaintiff received a letter to return to work at DRMO; (8) on February 17, 2005, plaintiff was put under a set of rules which he considered to be house arrest; (9) on February 23, 2005, plaintiff received news that his father-in-law had passed away; on February 24, 2005, he received a call from his supervisor denying him leave and ordering him to come back to work; plaintiff had already bought plane tickets and was leaving; when he returned to work on March 4, 2005, he was charged with AWOL, his pay was deducted, and he was issued a formal reprimand; and (10) on October 4, 2005, plaintiff asked a co-worker and his supervisor to escort him into the yard to take pictures for a customer, but they refused.  Dep. at 29; Dep., Ex. 1 at 42-43.

1       Plaintiff was given a Notice of Decision – Reprimand on or about March 28, 2005, for

2 his AWOL offenses and for failure to request leave in accordance with established procedures.

3 Dep. at 94-95; Dep., Ex. 1 at 24-25, Ex. 2 at 54-55; Def.'s Ex. 64.

4       Plaintiff retired on or about April 30, 2006, and in late 2006 or early 2007, was approved

5 by the Office of Personnel Management for disability retirement.  Dep. at 14-15; Dep., Ex. 2 at

6 73-74.

7       On May 30, 2006, an EEOC administrative judge issued a decision adverse to plaintiff,

8 without a hearing, and on June 30, 2006, the Defense Logistics Agency issued a final agency

9 decision, adopting the administrative judge's decision.  Dep. at 29-31; Dep., Ex. 1 at 54-68.

10 Plaintiff appealed the decision to the Office of Federal Operations ("OFO") in July 2006, and the

11 OFO denied the appeal in September 2007.  Dep. at 31; Dep., Ex. 1 at 69-74.

12 III.   <u>MOTION FOR SUMMARY JUDGMENT</u>

13       Defendant moves for summary judgment on all of plaintiff's claims, contending that (1)

14 plaintiff cannot establish a *prima facie* case of failure to accommodate; (2) plaintiff cannot

15 establish a *prima facie* case of disability discrimination, and even if he could, he cannot rebut

16 defendant's legitimate, nondiscriminatory reasons for its actions; (3) plaintiff cannot establish a

17 *prima facie* case of national origin discrimination; and (4) plaintiff cannot establish a *prima facie*

18 case of retaliation.  Dckt. No. 33.

19     A.   <u>Summary Judgment Standard</u>

20       Summary judgment is appropriate when it is demonstrated that there exists "no genuine

21 issue as to any material fact and that the moving party is entitled to a judgment as a matter of

22 law." Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

23        always bears the initial responsibility of informing the district court of the basis
         for its motion, and identifying those portions of "the pleadings, depositions,

24        answers to interrogatories, and admissions on file, together with the affidavits, if
         any," which it believes demonstrate the absence of a genuine issue of material

25        fact.

26 *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See N.W. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts; e.g., issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex*, 477 U.S. at 323.

Focus on where the burden of proof lies as to the issue in question is crucial to summary judgment procedures. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem*

*Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).  In this regard, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.   In attempting to establish the existence of a factual dispute that is genuine, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  However, the opposing party must demonstrate with adequate evidence a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).   The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson*, 477 U.S. at 248, 252.  If the evidence presented could not support a judgment in the opposing party's favor, there is no genuine issue.  *Id.*; *Celotex*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  *See Anderson*, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is

1   some metaphysical doubt as to the material facts . . . .   Where the record taken as a whole could

2   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

3   trial.'"   *Matsushita*, 475 U.S. at 587 (citation omitted).

4      B.      Analysis

5            1.      Plaintiff's Title VII Claim Based on His National Origin

6         Title VII, 42 U.S.C. §§ 2000e *et seq*., forbids employment discrimination based on race,

7   color, religion, sex, or national origin.   42 U.S.C. § 2000e-2(a)(1); *Brown v. Gen. Servs. Admin.*,

8   425 U.S. 820, 825, 829, 834-35 (1976).[5]   An employee may show violations of Title VII by

9   proving disparate treatment, a hostile work environment, or retaliation for protected activities.

10        To establish a *prima facie* case of disparate treatment under Title VII, plaintiff must

11  introduce evidence that "give[s] rise to an inference of unlawful discrimination."   *Yartzoff v.*

12  *Thomas*, 809 F.2d 1371, 1374 (9th Cir. 1987) (quoting *Texas Dep't of Community Affairs v.*

13  *Burdine*, 450 U.S. 248, 253 (1981)).   Plaintiff must demonstrate that (1) he is a member of a

14  protected class, (2) he was performing his job in a satisfactory manner, (3) he suffered an

15  adverse employment decision, and (4) he was treated differently than similarly situated persons

16  outside his protected class.   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).   If

17  plaintiff establishes a *prima facie* case, the burden of production shifts to defendant to articulate

18  a legitimate, nondiscriminatory reason for the employment decision.   *Leong v. Potter*, 347 F.3d

19  1117, 1124 (9th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802).   If defendant offers a

20  nondiscriminatory reason, the burden returns to plaintiff to show that the articulated reason is a

21  pretext for discrimination.   *Leong*, 347 F.3d at 1124 (citing *McDonnell Douglas*, 411 U.S. at

22  804).   To succeed in carrying the ultimate burden of proving intentional discrimination, plaintiff

23

24        [5] Disability is not a protected class under Title VII.   *See Williams v. Holiday Inn*, 1996
    WL 162992 (N.D. Cal. Mar. 13, 1996) (dismissing all of the employee's disability
25  discrimination claims under Title VII).   Therefore, plaintiff's disability discrimination and
    failure to accommodate claims are analyzed pursuant to the Rehabilitation Act.   Although
26  plaintiff cites to the Americans with Disabilities Act ("ADA") throughout his opposition, the
    ADA does not apply to the United States.   42 U.S.C. § 12111(5)(B)(i).

may establish a pretext either directly, by showing that the employer was more likely motivated by a discriminatory reason, or indirectly, by showing the employer's proffered reason is unworthy of credence. *Fragante v. City and County of Honolulu*, 888 F.2d 591, 595 (9th Cir. 1989) (citing *Texas Dep't of Community Affairs*, 450 U.S. at 253).

To establish a *prima facie* case of retaliation, plaintiff must establish that "(1) he engaged in protected activity, (2) he suffered an adverse personnel action, and (3) there was a causal link between the two." *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988); *Yartzoff*, 809 F.2d at 1375. In establishing a causal link, plaintiff must show that the alleged discriminator had knowledge of the protected activity. *Cohen v. Fred Meyer, Inc.*, 686 F.2d 796, 796 (9th Cir. 1982). If plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its decision. Once an employer does so, plaintiff bears the burden of proving the reason was merely pretext for a retaliatory motive. *Id*.

Finally, to establish a *prima facie* case of hostile work environment premised on national origin, plaintiff must establish that (1) he was subjected to verbal or physical conduct of a harassing nature that was based on his national origin, (2) the conduct was unwelcome, and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment." *Kang v. U. Lim Am.*, *Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (quoting *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998)). The conduct must be extreme in order to amount to a change in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).

Plaintiff contends that he was discriminated against because of his national origin. Compl. at 2. However, in his deposition, he stated that the only discrimination he suffered as a result of his national origin was the fact that Waring referred to him as "Eddie K," rather than by his full name, as Waring did with other employees. At the deposition, plaintiff testified:

> Q: You said you were stereotyped. In what regard?
> A: I just said that.
> Q: I mean stereotyped –

A:  I wasn't smart enough.

Q:  Because you were Hawaiian?

A:  No, because I wasn't smart enough and – I don't know.  I – I would think – I don't know.  I don't know – I don't know why I was stereotyped.  I don't know.  Because I wasn't smart enough, I guess.

Q:  But you claim it's because you were Hawaiian.  How was that?

A:  No, no.  *I was just talking about my name*, you know.  And I have an accent.  I've had an accent.

Q:  You're talking about stereotyping.

A:  Yeah.  So I brought that up because of my name.  The stereotyping thing, because I was placed into jobs where I could have done other jobs too.

Q:  But based on –

A:  Intelligence.  My intelligence.  Probably intelligence.

Q:  How does that relate to being Hawaiian?

A:  No, no.  The other – *it's just my name.  Ka'anoi.  The pronunciation of my name.  I was taken back by that.  Instead of saying my last name, you know, respectfully, it was just always Eddie K.  That's my big gripe right there.  It's not a big deal, but it's a big deal if you think about it.*

Q:  Any other acts pertaining to their being discriminati[on] against you based [upon] your national origin?

A:  It was based on my national origin, being my – *I felt it was my name and my intelligence*.  I wasn't smart enough maybe to do certain jobs, so I was put into jobs that I do well.  I wasn't given a chance to do other jobs.  In fact, Roger Waring mentioned – Roger Waring says that in the investigation report.

Q:  Intelligence is not a protected –

A:  It doesn't matter.  I understand.

Q:  Okay.  Then, your discrimination based on disability.  Well, getting back to –  with regards to national origin, did Mr. Waring ever say anything derogatory to you about being Hawaiian or about Hawaiians?

A:  No.  He questioned – just questioned if I was talking about a certain thing that I wanted to do, then he would be negative to it, whatever it was.  It's not –

Q:  How would that associate with [being] Hawaiian?

A:  I don't think so.  Not at that point, no.  *It was my name that was a big problem.*

Q:  *So that was it exclusively?*

A:  *Yes.*

Dep. at 133-35 (emphasis added).[6]

---

[6]  Although plaintiff states in his opposition that "DRMS Roger Waring[] would stereotype [him] and not let him learn other jobs," Dckt. No. 41-2 at 27, plaintiff stated in his deposition that his entire national origin discrimination claim is based on his supervisor calling him "Eddie K."  Moreover, plaintiff's contention that his not being allowed to learn other jobs was discrimination based on his national origin is conclusory and devoid of any detailed facts

An adverse personnel action is one that "materially affect[s] the compensation, terms, conditions, or privileges of the [plaintiff's] employment." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000). Being addressed as "Eddie K" did not materially affect the compensation, terms, conditions, or privileges of plaintiff's employment. Additionally, plaintiff has not shown that he was called "Eddie K" because of his national origin or because he engaged in any protected activity. *See Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1410 (9th Cir. 1987) ("Jurado's *prima facie* disparate treatment case fails because there is insufficient evidence that KIIS discharged him for discriminatory motives."). Therefore, plaintiff has not made out a *prima facie* case of disparate treatment or retaliation under Title VII.

Plaintiff has not presented evidence to establish that his being addressed as "Eddie K" was sufficiently severe or pervasive to alter the conditions of his employment such that it created an abusive working environment, especially since plaintiff testified that this was a name he commonly used and was addressed by many people outside of work, and was his stage name for entertainment purposes. Dep. at 9, 130. It appears from his deposition testimony that the informality of the use of that name was taken as demeaning generally, but there is no indication that the use of this name was taken as an ethnic slur or epithet. Moreover, even if it was interpreted subjectively in that manner (which plainly contradicts plaintiff's own common use of the name) its use alone does not demonstrate an alteration of the conditions of employment here. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("'[M]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violate Title VII.") (citation omitted). Plaintiff has not demonstrated a work environment permeated with ethnic ridicule or hostility. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (Only when "the workplace is permeated with discriminatory intimidation, ridicule, and insult," are the actions sufficiently "severe or pervasive to alter the

and supporting evidence and, therefore, is insufficient to defeat a motion for summary judgment. *Nelson v. City of Davis*, 571 F.3d 924, 929 n.2 (9th Cir. 2009).

1  conditions of the victim's employment."). Additionally, as noted above, plaintiff has not shown

2  that he was called "Eddie K" because of his national origin. Accordingly, plaintiff has not made

3  out a *prima facie* case of harassment or hostile work environment under Title VII.

4      Therefore, defendant is entitled to summary judgment on plaintiff's Title VII national

5  origin discrimination claims.

6          2.    Plaintiff's Rehabilitation Act Claims

7      The Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, prohibits discrimination on the basis of

8  disability by various federal contractors and recipients of federal funds and makes all Title VII

9  rights and remedies available to a person complaining of employment discrimination on the basis

10  of disability. *See Boyd v. U.S. Postal Serv.*, 752 F.2d 410, 412-13 (9th Cir. 1985); 29 U.S.C.

11  § 791(a)-(b). The implementing regulations of the Rehabilitation Act provide that federal

12  agencies "shall give full consideration to the hiring, placement, and advancement of qualified

13  individuals with disabilities." 29 C.F.R. § 1614.203(a). The regulations further specify that the

14  standards used to determine a violation of the Rehabilitation Act are those set out in the ADA

15  relating to employment. *Id.* § 1614.203(b); *see also Vinson v. Thomas*, 288 F.3d 1145, 1152 n. 7

16  (9th Cir. 2002).

17          a.    Failure to Accommodate

18      The Rehabilitation Act requires government agencies to reasonably accommodate an

19  employee's disability. *See* 29 U.S.C. § 794; *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169,

20  1176 (9th Cir. 1998); *Vinson*, 288 F.3d at1154. When a plaintiff alleges a failure to

21  accommodate a disability under the Rehabilitation Act, the burden is on that plaintiff to prove

22  that he is a qualified individual with a disability, and that "with or without reasonable

23  accommodation, [he could] perform the essential functions of [his] job." *See Buckingham v.*

24  *United States*, 998 F.2d 735, 739-40 (9th Cir. 1993). Then, if accommodation of the plaintiff as

25  a qualified individual with a disability is required to enable the plaintiff to perform the essential

26  functions of the job, the plaintiff must provide evidence sufficient to make at least a facial

showing that reasonable accommodation is possible.[7]  *Id*. at 740.  If in response to the plaintiff's evidence that reasonable accommodation can be made, the employer presents credible evidence that reasonable accommodation is not possible or practicable, the plaintiff bears the burden of coming forward with evidence that suggests that accommodation may in fact be reasonably made.  *See Sisson v. Helms*, 751 F.2d 991, 993 (9th Cir. 1985).

Plaintiff contends that defendant failed to accommodate his disability by denying him "light duty."  Compl. at 1.  Defendant does not dispute that plaintiff has a disability, but instead argues that plaintiff was not able to perform the essential functions of his job with or without accommodation and that plaintiff *was* provided a reasonable accommodation since he was offered (and accepted) a position consistent with his work limitations, while maintaining his title and pay.  Dckt. No. 33 at 16-17.

Plaintiff admitted that, even with accommodations, he could no longer perform the essential functions of his job as a Materials Examiner and Identifier.  Specifically, in his EEO affidavit, plaintiff stated that "[t]he major job duties involved driving a forklift, and front end-loader, loading and unloading materials and scrap materials[, and p]hysically moving items where necessary, checked documentation, separated and segregating materials," and that he could "no longer perform these duties with or without accommodation," which is why he "transferred to the office job."  Pl.'s EEO Aff. ¶¶ 4, 5.  Plaintiff later stated in his deposition that he should have been accommodated by "let[ting] somebody else physically do the job.  Drive the forklift, unload the trucks, load the trucks . . . ."  Dep. at 68-69, 125-29; *see also* Dep., Ex. 2 at 108 ("I couldn't do that job anymore, so mentally and physically, no, I could not.  But when they did offer me the office job, now I felt that I probably could do that . . . ."); Dep. at 16 ("I could no longer do the job I was hired for, which was the warehouse job.").  Therefore, plaintiff is not

---

[7]   Under the Rehabilitation Act, a "qualified individual" is an individual with a disability "who, with or without reasonable accommodation, can perform the essential functions of [the] position."  29 C.F.R. § 1630.2(m).  Essential functions are the fundamental duties of the relevant position.  29 C.F.R. § 1630.2(n)(1).

a qualified individual with a disability because he cannot perform the essential functions of his

position with or without accommodation. *Sanders v. Potter*, 2009 WL 57540, at *6 (W.D. Wash.

Jan. 8, 2009) (citing 29 C.F.R. § 1630.2(m)); *Bartolutti v. Mukasey*, 2008 WL 1924195, at *6

(W.D. Wash. Apr. 28, 2008).[8]

Nonetheless, as defendant points out, plaintiff was offered, and accepted, a position

performing office work that comported with his physical limitations, in which plaintiff

maintained his Materials Examiner and Identifier title and the same pay.  Dep. at 84; Dep., Ex. 2

at 41-49.  Plaintiff does not dispute that this was a reasonable accommodation.  Dckt. No. 41-2 at

11.  But, plaintiff contends that this accommodation was made too late – he argues that

defendant swept away 6½ months of his life, from July 26, 2004 to February 10, 2005, since he

was denied modified work or light duty during that time period.  Dckt. No. 41 at 6, 41-2 at 7.

However, plaintiff did not formally or informally request an accommodation.  Dep. at 68-

71.  Once an employer becomes aware of the need for accommodation, that employer has a

mandatory obligation to engage in an interactive process with the employee to identify and

implement appropriate reasonable accommodations.  *Hunphrey v. Mem'l Hosp. Ass'n*, 239 F.3d

1128 (9th Cir. 2001) (citing *Barnett v. U.S. Air*, 228 F.3d 1105, 1114 (9th Cir. 2000).  The

interactive process for finding a reasonable accommodation may be triggered by a request by the

employee or by the "employer's recognition of the need for such an accommodation, even if the

employee does not specifically make the request." *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182,

---

[8]  Plaintiff contends that defendant's argument that he was unable to perform the essential functions of his job is confusing because it is unclear what job is at issue. Dckt. No. 42-3.  Here, because plaintiff never requested a job transfer or reassignment to a different position, the job at issue was plaintiff's Materials Examiner job, which plaintiff conceded on multiple occasions he was unable to perform.  Nonetheless, even if plaintiff had requested a transfer or reassignment to a different position, plaintiff has failed "to come forward with evidence demonstrating that the position sought existed at the time it was requested" or that "the position open was one with terms and conditions of employment equivalent to that of his prior job, and that the position is vacant within a reasonable amount of time." *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999).

1188 (9th Cir. 2001).  Although an employee need not make a request for accommodation in

writing and the employee need not use specific words to request accommodation, the employee

must make a request to his employer for modifications of his duties due to his disability as the

"[e]mployers cannot assume employees are disabled and need accommodations."  *Taylor v.*

*Phoenixville School Dist.*, 174. F.3d 142, 159 (3d Cir. 1999).  If plaintiff fails to request an

accommodation, an employer is only required to initiate the interactive process if "the employer

(1) knows that the employee has a disability, (2) knows, or has reason to know, that the

employee is experiencing workplace problems because of the disability, and (3) knows or has

reason to know, that the disability prevents the employee from requesting a reasonable

accommodation."  *Brown*, 246 F.3d at 1188.

Here, plaintiff did not request an accommodation and has offered no evidence to show

that he comes within the exception to the general rule that an employee must initiate the

interactive process by requesting an accommodation.  He has not shown that he has a disability

that prevented him from requesting a reasonable accommodation, or that his supervisors were

aware that he was experiencing workplace problems because of the disability.  Waring EEO Aff.,

Dckt. No. 33-3 at 14 ("He was not denied light duty.  He did not request light duty and had he

requested it he would have been put on light duty."); Kerr EEO Aff., Dckt. No. 33-3 at 21 ("I do

not believe that he made any formal request for accommodation.").

Further, plaintiff was on sick leave (due to depression and stress) from October 27, 2004

through February 15, 2005, so plaintiff's employers had no reason to find plaintiff a reasonable

accommodation during that time period.  As for the time between the injury and October 27,

2004, plaintiff continued to work in the industrial yard, but acknowledges that he modified the

way he functioned in the position.  Dep. at 60, 67-70.  For example, he would "use a lot of arm

work to get off and on a forklift" and would do everything "gingerly" and in moderation.  Dep.

at 68.  Additionally, defendant did not have any medical records suggesting that plaintiff could

not continue his job with specific medical limitations imposed.  Dep. at 68-71; Dep., Ex. 2 at 21,

23, 35, 39.  It was not until January 2005 that a doctor recommended that plaintiff remain off

work until after a vocational rehabilitation evaluation and that plaintiff needs "vocational rehab

for [a] different job."  Depo at 83; Dep., Ex. 2 at 39.  Therefore, there is no indication that

plaintiff's employers were aware that plaintiff needed a further accommodation during that time

period.

Since there is sufficient evidence to demonstrate that plaintiff was not able to perform the

essential functions of his job, with or without a reasonable accommodation, and that defendant

granted plaintiff a reasonable accommodation, defendant is entitled to summary judgment on

plaintiff's Rehabilitation Act claim premised on a failure to accommodate theory of liability.[9]

### b.   Discrimination Based on Plaintiff's Disability

In order to establish a *prima facie* case of disability discrimination under the

Rehabilitation Act, plaintiff must demonstrate that: (1) he is an individual with a disability

within the meaning of the Rehabilitation Act; (2) he can perform the essential functions of the

position with or without reasonable accommodation; and (3) his employer discriminated against

him, via an adverse employment action, solely because of his disability.  *See Mustafa*, 157 F.3d

at 1174-76; *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1058 (9th Cir. 2005).  Where the

employer provides a legitimate, non-discriminatory reason for its adverse employment decision,

plaintiff must then show that the employer's explanation was really a pretext for disability

discrimination.  *Brown v. Shinseki*, 2009 WL 1974444, at *1 (9th Cir. June 17, 2009) (citing

*Collings v. Longview Fibre Co.*, 63 F.3d 828, 833 (9th Cir. 1995)).

As stated above, defendant does not dispute that plaintiff has a disability within the

meaning of the Rehabilitation Act.  However, also as stated above, plaintiff admitted that he was

unable to perform the essential functions of his job with or without reasonable accommodation.

_____

[9]  Plaintiff also contends that the denial of light duty amounted to disability discrimination; however, such a claim fails for the same reasons that plaintiff's failure to accommodate claim fails, and because the failure to provide light duty did not amount to an adverse employment action or that the denial of light duty was based on his disability.

1   Therefore, plaintiff is unable to make out a *prima facie* case for disability discrimination.

2   Nonetheless, the court will address each of the allegedly discriminatory acts that plaintiff asserts

3   defendant committed.

4          Plaintiff contends that even though his supervisors already had information about his

5   medical condition, on October 12, 2004, Kerr asked him for more information about his on-the-

6   job injury; on October 26, 2004, Kerr sent him an email which mocked his injury; on November

7   18, 2004, Kerr called plaintiff's home and threatened him with AWOL if he did not send in a

8   doctor's note allowing him to stay home; and on December 22, 2004, he received a harassing

9   letter from Kerr threatening to deny his absences, to put him on AWOL, and to subject him to

10  disciplinary action.  Dep. at 29; Dep., Ex. 1 at 42-43; Def.'s Ex. 16, 17, 21A, 25.  Plaintiff

11  contends these calls/emails were unnecessary in light of the medical documentation that he

12  already provided to his supervisors.  Dckt. No. 41 at 6.

13         However, these actions did not amount to discrimination or adverse employment actions

14  because they did not materially affect the compensation, terms, conditions, or privileges of

15  plaintiff's employment.  Additionally, plaintiff has not established that the actions were taken as

16  a result of his disability.  Rather, they constituted legitimate requests for documentation

17  regarding plaintiff's request for approval of sick leave.  Specifically, the October 12 email

18  expressed concern and suspicion as to whether plaintiff's injury resulted from his job at DRMS

19  or from his additional, part-time employment, Dep. at 57-58; Dep., Ex 4; Def.'s Ex. 16; the

20  October 26 email requested clarification regarding the nature of plaintiff's injury, when and

21  where it occurred, and plaintiff's current health status,  Dep., Ex. 3; Def.'s Ex. 17; the November

22  18 phone call was either to ask for additional health information from plaintiff (according to

23  plaintiff) or to inform plaintiff about the agency's requirements for supporting sick leave

24  (according to Kerr), Def.'s Ex. 21; Kerr Aff. ¶ 13.c; and the December 22 letter requested

25  substantiation of plaintiff's sick leave after plaintiff's supervisor saw an article and a picture in

26  the local newspaper indicating that plaintiff had provided entertainment at a holiday pageant

during a time when he was relieved from work due to his disability.  Dep., Ex. 1 at 21, Ex. 2 at

23; Def.'s Ex. 25; Kerr Aff. ¶ 13.f.  As defendant notes, the agency was permitted, and in fact

required, to ask plaintiff for documentation supporting his request for approval of sick leave.

Dckt. No. 33 at 19-20 (citing 5 C.F.R. § 630.403(a), which provides that an agency may grant

sick leave only when it is supported by administratively acceptable evidence, and may require a

medical certificate or other administratively acceptable evidence as to the reason for an absence

in excess of three workdays, and 29 C.F.R. Pt. 1630, App. 1630.9, which provides that an

employer may require from an employee documentation of the need for accommodation); *see*

*also Wade*, 2009 WL 1186638, at *14 ("As to advanced sick leave, Wade claims that he was

denied 160 hours of advanced sick leave because of his race.  However, Wade did not provide

adequate medical documentation to support his request.  An employer may obtain medical

documentation before granting or denying a request.").

Plaintiff further contends that on October 20, 2004, he was verbally attacked by Waring

about why he did not use his private medical insurance after his on-the-job injury, and that he

took this remark as an attack on his integrity.  Dep. at 29; Dep., Ex. 1 at 42-43, 50. Waring avers

that after plaintiff "mentioned that he was not referred to a workman's comp doctor and was

upset that he wanted a workman's comp doctor to check out his injury," Waring suggested that

plaintiff "go see his own doctor (it['s] only a $5.00 co-pay) and get treatment," and stated that if

plaintiff did not have authorization to seek treatment from a worker's comp physician, "he

should not wait and suffer from pain."  Waring Aff. ¶ 12.d.  However, even taking as true

plaintiff's assertions that he was verbally attacked by Waring about why he did not use his

private medical insurance after his on-the-job injury, plaintiff has not shown how the statements

he alleges amount to an adverse employment action or other discrimination, or that the "attacks"

were made because of plaintiff's disability.  *See Dilbert v. Potter*, 2009 WL 1517734, at *8

(N.D. Cal. June 1, 2009) ("[A]side from generalized references to 'verbal abuse' and email

messages, Plaintiff has failed to proffer any evidence or to present any argument as to how the

comments or emails support his discrimination claims.").

Plaintiff also argues that on February 11, 2005, he was sent an offer to return to work at DRMS in a sedentary, non-supervisory office automation job which was unclear regarding the location of plaintiff's employment (specifically, plaintiff alleges that defendant was trying to "trick" him by requiring him to work in Stockton, California rather than at Travis AFB). Dep. at 29; Dep., Ex. 1 at 42-43; Def.'s Ex. 43; Dckt. No. 41-2, at 22. When plaintiff reported to DRMS at Travis AFB on February 14, 2005, he was instructed to go to DRMS in Stockton. While in Stockton, he was given the impression that Stockton was the site of his new job, and in a state of confusion, he drove back to Travis AFB. Plaintiff contends this was all a "trick."

However, even if the incorrect offer letter was a trick, plaintiff has not shown that it constituted discrimination or amounted to an adverse employment action, or that the "trick" was because of plaintiff's disability. *See Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000). Moreover, as defendant notes, even if the February 11 offer letter changed the terms and conditions of plaintiff's employment, an amended offer letter was sent to plaintiff on February 16, 2005, clarifying the duties that were to be performed at Travis AFB. Dep., Ex. 2 at 46-48; Def.'s Ex. 44. Plaintiff acknowledges that the error was corrected in the amended offer letter. Dep. at 152.

Plaintiff further contends that when he returned to work his new sedentary job on February 17, 2005, he was put under a set of rules which he considered to be house arrest. Dep. at 29; Dep., Ex. 1 at 42-43, 51; Pl.'s EEO Aff. ¶ 8. Specifically, plaintiff complains that he was restricted from going out into the industrial yard without an escort, and was required to call the Stockton office upon his arrival to work in the morning. Dep. at 153-54; Def.'s Ex. 51, 52. However, plaintiff's new position did not require him to enter the industrial yard and he was able to go anywhere in the building. Dep. at 155. Thus, the fact that he could not go into the yard without an escort, and the fact that he was required to call into the Stockton office when he got into work, did not amount to adverse employment actions. Additionally, plaintiff has not

presented evidence that such restrictions were because of plaintiff's disability.  Further, even if

he could establish these required elements, defendant has presented evidence that plaintiff was

prohibited from entering the industrial yard without an escort because he had no reason to go

there and that was the location where he had suffered an injury, and that plaintiff was required to

call into the Stockton office when he got to work because plaintiff had a pattern of tardiness.[10]

Kerr EEO Aff., Dckt. No. 33-3 at 23 ("It was not intended to be 'house arrest' it was to keep him

our of the industrial area where he had been injured."); Waring EEO Aff., Dckt. No. 33-3 at 15

("Mr. Kerr made a remark that since [plaintiff] had an injury and was under light duty, there was

no need for [plaintiff] to be in the yard, and that if he did need to go to the yard for some reason

he should be accompanied by myself [or] another co-worker.  This was a restriction, but not

'house arrest' by any means.").  Plaintiff has not shown that these explanations are really a

pretext for disability discrimination.  *Dilbert*, 2009 WL 1517734, at *8 ("Plaintiff has failed to

proffer evidence demonstrating that the requirement that he begin his work day at 7:30 a.m. or

his being placed on restricted sick leave was due solely to the fact that he was disabled.  Rather,

as indicated above, [defendant] articulated legitimate non-discriminatory reasons for both

---

[10]  *See* Pl.'s Dep., at 160 ("I came in late sometimes, but not all the time.  Not – not –
there was times when the train would show up down the road just before 7:00 . . . .  There was
traffic jams or – "); Waring EEO Aff., Dckt. No. 33-3 at 13-14 ("It is no secret that the DRMO
organization is downsizing and [plaintiff's] position is in the category to be abolished.  With this
knowledge over the last couple of years, I have noted a tendency on his part to come in late fairly
often; by this I mean four or five days a week.  At first it was just a few minutes, but it got worse
to the point of ten to fifteen minutes late. . . .  When asked by Mr. Kerr about his work habits, I
had to be truthful and state that he was developing a pattern of tardiness and I was scolded for
not documenting it."); Kerr EEO Aff., Dckt. No. 33-3 at 21-22 ("After the RIF notification and
during his sick leave period I asked the site supervisor, Mr. Waring about [plaintiff's] attendance
and other performance related conduct.  Mr. Waring advised me that from at least the time of the
RIF notice, but I believe it preceded that time as well, that [plaintiff] consistently came in late in
the morning, sometimes up to 25 minutes late.  Mr. Waring is kind of a casual manager and did
not make a big deal of the tardiness, for which I scolded him, as he did not document the
tardiness, and in effect contributed to the problem with [plaintiff] by not taking corrective action.
I then placed requirements on [plaintiff] to call in to the Stockton office every morning at 0700
to confirm that he was on time.  I believe that on one occasion we actually docked his pay for 15
minutes just to show that we were serious, but relaxed the requirement in about September 2005
when [plaintiff] showed a pattern of improved arrival.").

1  decisions, neither of which related to Plaintiff's disabilities.  Because Plaintiff cannot make this

2  showing, any disparate treatment claim under the Rehabilitation Act necessarily fails, entitling

3  Defendant to summary judgement on such claim.").

4       Plaintiff further argues that on February 23, 2005, he received news that his father-in-law

5  had passed away; that on February 24, 2005, after requesting emergency leave, he received a call

6  from his supervisor denying him leave and ordering him to come back to work; that plaintiff had

7  already bought plane tickets, so he left anyway; and that when he returned to work on March 4,

8  2005, he was charged with AWOL, his pay was deducted, and he was issued a formal reprimand.

9  Dep. at 29; Dep., Ex. 1 at 42-43.  Plaintiff argues that the reprimand, the AWOL charge, and the

10  deduction in pay amounted to an adverse action resulting from plaintiff's disability.  Dckt. No.

11  41 at 8.

12       Defendant acknowledges that deduction of pay for being AWOL is an adverse

13  employment action.  Dckt. No. 43.  However, defendant contends that plaintiff cannot establish

14  that this action was discriminatory based on disability.  Rather, DRMS had legitimate

15  nondiscriminatory reasons for denying plaintiff's leave request and charging him with being

16  AWOL and ultimately deducting his pay for the time he was absent.

17       The parties do not dispute that plaintiff was out of the office for five days to attend his

18  father-in-law's funeral; they dispute the way in which plaintiff requested leave to attend the

19  funeral and how much leave was approved.  Plaintiff contends that Kerr told him he would

20  "work with him" and that therefore, plaintiff was authorized to take as much time as he needed.

21  Defendant contends that plaintiff was authorized to take two days' leave (in addition to the

22  weekend), and when plaintiff told Kerr that he might need more time off, Kerr told plaintiff to

23  contact him if he needed more time.  Kerr Aff. ¶ 13.i; Kerr Decl., Dckt. No. 43-2, ¶¶ 6-7.  Kerr's

24  account of the request and authorization is a follows:

25       [O]n February 23, 2005, plaintiff phoned Connie Allen, who was
        my assistant at the Stockton office, and left her a message that, due

26       to the death of his father-in-law in Missouri, he needed to take a

> couple of days off.  On or about February 23, 2005, I spoke with plaintiff by telephone and explained to him that I could authorize him only two days off, which would be in conjunction with a weekend, because Roger Waring was already scheduled to be out of the Travis AFB office during that same time frame due to the death of his mother.  I approved plaintiff's request for leave for February 24-25, 2005.  Plaintiff, however, remained out through March 2, 2005. Because plaintiff was absent without approval for February 28 - March 2, 2005, I charged his absence as AWOL.  It was necessary to limit plaintiff's leave due to the workload at Travis, and because Roger Waring was out of the Travis office during that same time frame due to the death of his mother.  At that time, the Travis office was basically a two-man operation: Roger Waring and plaintiff.

*Id.* According to Kerr, the leave was restricted to two days because of the circumstances at the time, and plaintiff was reprimanded because he was required to get pre-approval of all of his requested leave and did not do so.

The Notice of Proposed Reprimand states that:

> the site-leader, Mr. Waring, was already on approved leave, due to the death of his [mother], from 22-29 February 2005. . . . I also stated that due to work load at Travis and absence of Mr. Waring, I would not have approved your request for leave. Due to funeral of your spouse's step-father in Missouri and your travel to his funeral, I did approve two days of leave, for February 24- 25 . . . .

Dep., Ex. 2 at 52.  Additionally, according to Kerr:

> it was necessary to limit plaintiff's leave due to the workload at Travis, and because Roger Waring was out of the Travis office during that same time frame due to the death of his mother.  At that time, the Travis office was basically a two-man operation: Roger Waring and plaintiff.

Kerr Decl. ¶ 7.

Although plaintiff argues that his reprimand and AWOL charge were unjustified because plaintiff did not violate any leave rules, there is no genuine dispute as to whether approval for leave must be obtained in advance or whether plaintiff took leave that he was not approved in advance to take.  Although plaintiff contends that when he spoke with Kerr on February 23, by plaintiff's own account Kerr told plaintiff he would "work with" him.  Significantly, plaintiff

does not contend that Kerr ever gave him direct authorization to take five days' leave. Plaintiff's subjective interpretation of the phrase "work with him" as a suspension of the rules that leave be actually approved is simply not reasonable. Neither is it a basis upon which a reasonable fact finder could concluded that his leave was denied based on a discriminatory or retaliatory animus.

Additionally, plaintiff does not dispute that Kerr also called plaintiff on February 24 and ordered him to come back to work, but plaintiff left anyway. Dckt. No. 41-3 at 28. Plaintiff states: "Mr. Kerr said that he would work with me regarding the leave. The next day, Mr. Kerr called me and asked me who died. I told him it was my father in law. He said he wanted me to come in to work. I advised him that we were already on our way to attend the funeral, airplane tickets had been purchased etc." Pl.'s EEO Aff., Dckt. No. 33-3 at 6; Dep. at 161 (agreeing that he received a call from Kerr denying him leave and ordering him to come back to work). Additionally, although plaintiff's leave request indicated that plaintiff "may need more time," he only listed two of the days on the leave form and only mentioned needing a "couple of days" in his message on Kerr's assistant's answering machine on February 23. Dep., Exs. 5, 6. The leave request form, which was signed on February 25, indicates that plaintiff was approved for leave on February 24 and 25 only. Dep., Ex. 6.

Plaintiff's most recent declaration states:

> I called Mr. Kerr on [] February 23, 2005 and Mrs. Rene Wise answered the phone. I told her I needed some leave time because my father-in-law just died and I needed to attend the funeral. . . . Kerr said to me . . . 'I'll work with you!' I was surprised [and] thanked him! . . . [T]hat was the whole conversation. I took this man's word thinking everything was fine and I was free to grieve with my wife. I filled out my bereavement leave and wrote 'I may need more time," and faxed the slip to him that very day. The next day on the 24th, he called my house and said, 'Who died!' I told him my father-in-law. He [then] said he wanted me to come back into work and I said, it was [too] late! I had already purchased the [plane] tickets. He [then] asked me when I was coming back [and] I said Wednesday the 2nd. He said okay and hung up the phone. I declare I did nothing wrong against any government leave rules.

Dckt. No. 46, ¶¶ 21-30. Even in this recent declaration, plaintiff acknowledges that Kerr told

1   plaintiff he wanted him to come back to work and that plaintiff said it was too late.  One thing

2   that is new in this declaration, however, is the addition of the clause "He said okay."  As a

3   threshold matter, this declaration was filed after defendant's motion was taken under submission

4   and is not authorized by Local Rule 78-230.  Neither has plaintiff obtained approval to submit it

5   nor has he shown good cause for the court to consider it.  Nonetheless, even considering the

6   declaration, there is no genuine issue as to whether plaintiff had approval from Kerr to take five

7   days' leave *prior to* taking the leave.  Assuming that Kerr said "okay" and hung up the phone

8   does not suggest that Kerr was approving plaintiff's five day leave request, especially in light of

9   the immediately preceding sentences which expressly reveal Kerr's position regarding plaintiff's

10   leave.  Moreover, this new clause conflicts with plaintiff's deposition testimony.  In his

11   deposition, plaintiff testified that on February 23, Kerr told plaintiff he would "work with" him,

12   but on February 24, Kerr called plaintiff and told plaintiff to come back into work:

13          A: The next day, [24th].  I've already got the tickets and
              everything was fine.  I'm believing that this man is [supporting]
14            me.  He says, 'I'll work with you,' and I'm fine.  And then the next
              day my wife and I, we're packing up, and he calls, he says, 'Who
15            died?'  I said, 'My father-in-law died.'  And he said, 'I want you to
              come back in and work.'  I said, 'It's too late.  I've already bought
16            these tickets.'  You know, it's time for me – and then he said, 'Oh.
              Oh well.'  And then he hung up.  He might have said when he –
17            when I was going to be back.  I think he might have said that.  I'm
              not positive I think he might have said that.  And I said
18            Wednesday.  Probably Wednesday, I said."

19                                              ***

20          A: . . .  But, anyway, so he hangs the phone up, and I go, Oh, my.  I
              don't know what's going on here."

21

22   Dep. at 163-64.

23          Later in the deposition, the following exchange occurred:

24          Q:  How many days did Mr. Kerr approve you for before you left?
            A:  He did not give me a reply.  I was on my way.  Remember, he
25            called me the next day.  He didn't say anything.  All I got from
              him was that I was still on my way and he was still working with
26            me.  That call about who died and when are you going to be back

1    is all I got.  And then he hung up the phone on me.  That was it.
     Q: So no mention that Roger Waring's mother had also died?
2    A: Oh, I knew she died.  She died on the same day.  It was like
     phenomenal.  It's amazing.  But that's what happened.  You have –
3    you have a supervisor that tells you I'll work with you and – I'm
     asking you this questions and you can be – and you can answer it
4    anyway you want.  If I told you I was going to work with you,
     that's a plus.  That's a normal reaction.  Whatever comes –
5    whatever you need, I'll work with you.  That's what I got from that
     man on the day on the 23rd when I was in grief.  That's it.  To
6    come back on the 2nd and get reprimanded, AWOL'd, treated like
     that, is out of this world.
7    Q: You're saying that when you talked to him he didn't limit you
     to two or three days?
8    A: No.
     Q: He didn't tell you – let me finish.  He didn't tell you that he
9    couldn't go without you too long because Roger Waring would
     also be out because of his mother passing away?
10   A: Absolutely no.  Absolutely did not say that to me.  He just said,
     'Who died?'  And, 'When are you going to be back?'  That's all I
11   can remember.  I think I heard the word 'Wednesday,' because I
     think I said that.  Because I'm anticipating the burial and the time
12   and all the business that we have to go through.  And I'm – I can
     remember – I think it was Wednesday.  I said Wednesday.
13   Q: And then when did you actually come back?
     A: Wednesday.

14

15   Dep. at 166-67.

16         As stated in the proposed reprimand, plaintiff was required to obtain approval for his

17   leave *before* he left.  Plaintiff's failure to do so was a legitimate and non-discriminatory reason

18   for Kerr to reprimand him, charge him AWOL, and deduct his pay.  Additionally, Kerr had a

19   legitimate and non-discriminatory reason to limit plaintiff's approved leave request to two days.

20   *See* Kerr EEO Aff., Dckt. No. 33-3 at 24.  ("I contacted the personnel office prior to talking to

21   [plaintiff].  I was advised that in ordinary circumstances a stepfather would not qualify as a close

22   family member and that I was within authority to deny leave all together.  I was not comfortable

23   with this and was advised that I could authorize two days leave, with the weekend would be four

24   days.  I advised [plaintiff] of this.  He said he might need more time.  I pointed out that he had no

25   leave on the books, but that he should recontact me if he needed more leave.  He did not do so.").

26   ////

The March 28, 2005 reprimand also resulted from plaintiff being AWOL on February 15-16, 2005, and late to work on February 22, 2005.  Dep., Ex. 1 at 24.  Plaintiff denies being late on February 22, 2005, but concedes that he did not timely call in to the Stockton office, as he was required to do.  In his deposition, plaintiff states: "I wasn't late for work.  I was three days into the job.  I came in, I started working, doing stuff, and I looked at the clock.  Oh, seven minutes after.  I'm supposed to call Stockton.  So I called Stockton.  They didn't listen to me, say nothing.  They said, 'You're late.  We're going to dock your pay.'  That was it."  Dep. at 158.

Additionally, plaintiff contends that he should not have been charged as AWOL for February 15-16, 2005 because the amended job offer (which he signed after the confusion regarding plaintiff's place of employment) was not signed until February 16, 2005, and plaintiff was not required to be at work until February 17, 2005 (he had already submitted a leave without pay form which was good for February 15 and 16).  Dckt. No. 46, ¶ 10; Dep., Ex. 1 at 27 (Plaintiff stated, in response to the proposed reprimand, that he "had fifteen days to [accept] the new job . . . and was not officially on board till the 17th of February because of a fraudulent communique you sent involving where my work and duty station would be.").  However, Kerr contends that after the confusion on February 14 regarding where plaintiff would be working, Kerr told one of his staff in Stockton to contact plaintiff and inform him that Kerr was on his way to Travis AFB to discuss the situation, but that when Kerr arrived, plaintiff was not there. Kerr Decl., Dckt. No. 43-2, ¶¶ 3-5.  Plaintiff does not dispute that Kerr made this request, but argues that it is inadmissible hearsay.  Dckt. No. 46, ¶ 10.  Plaintiff states in his deposition, in response to a question regarding whether he was instructed to stay at Travis AFB on February 15 because Kerr was on his way there: "No.  I heard – I heard them say that Mr. – Mr. Kerr might be coming by.  And he might have said they wanted me to stay, but there was no reason for me to stay because I'm saying, you know, this has nothing to do with Mr. Kerr or anyone.  It's something to do with this job offer that's wrong.  So it was nothing to do with that.  I said, 'You

guys straighten this out and then we'll start all over because this is not right.'"  Dep. at 91-92.
Although plaintiff's amended job offer was not signed until February 16, defendant has shown a
legitimate, non-discriminatory reason for reprimanding plaintiff for being AWOL on February
15 and 16, and for not timely calling into the Stockton office on February 22.

Because Kerr offered legitimate, non-discriminatory explanations for his conduct,
plaintiff was required to show that those reasons were pretextual – either directly, by showing
that Kerr was more likely motivated by a discriminatory reason, or indirectly, by showing that
Kerr's proffered reason is unworthy of credence.  *Fragante*, 888 F.2d at 595.  Here, plaintiff has
not offered any direct evidence that Kerr's denial of additional leave, reprimand, AWOL charge,
and/or deduction in plaintiff's pay were motivated by a discriminatory reason, or shown that
Kerr's proffered reasons are unworthy of credence.[11]  In fact, both Waring and Kerr declare that
plaintiff's disability did not play any role in their decisions.  When asked whether plaintiff's
national origin, disability status or prior EEO activity were factors in any of the actions taken,
Kerr stated: "Not at all, as I said I was unaware of his national origin, there was no prior EEO
activity, and [plaintiff] was given an accommodation job for his claimed physical condition."
Kerr EEO Aff., Dckt. No. 33-3 at 24.  When asked whether plaintiff's national origin, disability
status or prior EEO activity were factors in any of the actions taken, Waring replied: "Absolutely
not."  Waring EEO Aff., Dckt. No. 33-3 at 16.  Waring also stated:  "I believe that everyone is
treated equally.  Mr. Kerr is a good and fair manager and I do not think he discriminated against

---

[11]  The fact that plaintiff contends that defendant did not discriminate against other
employees with disabilities suggests that defendant's proffered reasons were *not* merely a pretext
for disability discrimination against plaintiff.  Pl.'s EEO Aff., Dckt. No. 33-3 at 6 ("Chris Wilson
has a back problem and he is treated just fine.  He gets the time off he needs for doctor's
appointment etc.  Walter Kelley used to be with us.  He had a back injury and was off for 45
days with no problems.  I am the only one who has received harassment.").

Additionally, the fact that plaintiff was given time off awards in November 2004 and
October 2005 imply a lack of discrimination against plaintiff.  Dep. at 171-72; 190; Kerr EEO
Aff., Dckt. No. 33-3 at 24-25 ("When I gave [plaintiff] the [award] in 2004, he may not have
been the most deserving employee who received an award, but it was also an incentive and an
encouragement in light of the downsizing and possible future [reductions in force].  I was
surprised and disappointed in his reaction and conduct since that time.").

[plaintiff] and I have not discriminated against him."  Waring EEO Aff., Dckt. No. 33-3 at 14.

Accordingly, defendant is entitled to summary judgment on this claim.  *See Brooks*, 229 F.3d at

930; *Newland v. Dalton*, 81 F.3d 904, 906 (9th Cir. 1996) (holding that "firings precipitated by

misconduct rather than any handicap do not violate the [Rehabilitation] Act."); *Wade*, 2009 WL

1186638, at *12 ("As to moving Wade to a different cubicle, Wade was moved after engaging in

two separate verbal altercations with his co-workers in which he used profanity and engaged in

menacing behavior.  Wade has no evidence to show that the move was motivated by

discriminatory animus or that Defendant's proffered reason is pretextual. Simply being a

member of [a] protected class does not prohibit an employer from disciplining an employee for

improper behavior."); *Trujillo v. U.S. Postal Serv.,* 2009 WL 1515670, at *1 (9th Cir. June 1,

2009) ("Trujillo presented no evidence that the USPS based its decision to terminate him on his

known disabilities. Rather, the evidence shows primarily that Trujillo's supervisor was upset

with him for being repeatedly late or absent. . . .  Trujillo did not show that his absences were

related to his known disabilities of cluster headaches or depression.  Rather, the specific

explanations he provided to the USPS did not involve either condition, but other unrelated

circumstances. Therefore, Trujillo failed to show that the USPS's decision to terminate him for

chronic absenteeism was related to his disability.").

     Finally, plaintiff contends that on October 4, 2005, he asked a co-worker and his

supervisor to escort him into the yard to take pictures for a customer, but they refused.  Dep. at

178.  However, plaintiff acknowledges that he received confirmation that "if [he was] trained to

go take pictures out in the yard now that [he could] go out into the yard unescorted, and that

ended that."  *Id*. at 181.  He also acknowledged that his co-worker and his supervisor refused to

escort him out into the yard because no one needed to escort him out into the yard to take

pictures.  *Id*. at 181-82.  Therefore, plaintiff has not established that this conduct amounted to an

adverse employment action, or that the alleged discriminatory act was taken solely because of

his disability.

1    Accordingly, defendant is entitled to summary judgment on his discrimination claims

2    under the Rehabilitation Act.

3                    c.    Retaliation

4    Plaintiff also alleges retaliation.  Compl. at 1; Dep. at 111, 183, 199.  Specifically,

5    plaintiff claims the following acts of retaliation:  harassment, job assignment, promotion,

6    compensation, and termination.  Compl. at 1.  Plaintiff contends that the reprisal/retaliation he

7    refers to "is that which has occurred since I filed this complaint" and contends that Kerr

8    retaliated against him "just two weeks after [he] filed the Discrimination Investigation,"

9    suggesting that plaintiff's retaliation claims are based on plaintiff's filing of an EEOC complaint.

10   Pl.'s EEO Aff. ¶ 13; Dckt. No. 41 at 9; Dckt. No. 46, ¶ 65 ("I declare that he committed reprisal

11   or retaliation on me after I filed my investigation into allegations of discrimination.").  Plaintiff

12   also says, however, that he was retaliated against "for getting hurt," "for being injured on the

13   job," and for reporting his injury.  Dep. at 111, 183; Dckt. No. 46, ¶ 50 ("I was discriminated

14   against in the work place . . . by DRMS, Clifford R. Kerr and Roger Waring for reporting an on

15   the job back injury, dated July 26, 2004 and filed on August 5, 2004"); Dckt. No. 41-2 at 16

16   ("Protected Activity: [Plaintiff] engaged in 2 disabling injuries. . . . Protected Activity: [Plaintiff]

17   engaged in signing his doctors' status reports ordering modified duties and handing them to the

18   DRMS agency.").

19   A *prima facie* case of retaliation requires a plaintiff to show: "(1) involvement in a

20   protected activity, (2) an adverse employment action and (3) a causal link between the two."

21   *Coons v. Sec'y of U.S. Dep't of Treasury,* 383 F.3d 879, 887 (9th Cir. 2004) (citing *Brown v.*

22   *City of Tucson,* 336 F.3d 1181, 1187 (9th Cir. 2003) (citation and internal quotation marks

23   omitted)).  The plaintiff must present "evidence adequate to create an inference that an

24   employment decision was based on an illegal discriminatory criterion."   *O'Connor v. Consol.*

25   *Coin Caterers Corp.,* 517 U.S. 308, 312 (1996) (citation and internal punctuation omitted).

26   ////

1    Once plaintiff establishes a *prima facie* case, the employer has the burden to "present legitimate

2    reasons for the adverse employment action." *Brooks*, 229 F.3d at 928.  At that point, the burden

3    shifts back to plaintiff to show that the reason advanced by the employer was a pretext.  *Id*.

4         Plaintiff claims that he was subjected to harassment, as discussed above.  Although it is

5    unclear whether plaintiff claims he was retaliated against for filing the EEOC complaint or for

6    getting injured and/or reporting that injury, in either case plaintiff has not established that he was

7    harassed as a result of engaging in a protected activity, or that the "harassment" constituted an

8    adverse employment action.  Further, "the Ninth Circuit, has never recognized the

9    [Rehabilitation] Act or the ADA as giving rise to a harassment claim."  *Fowler v. Potter*, 2008

10   WL 2383073, at *9 (N.D. Cal. June 9, 2008) (citing *Brown v. City of Tucson*, 336 F.3d 1181,

11   1188-93 (9th Cir. 2003) (distinguishing anti-interference claim from hostile work environment

12   claim).  Regardless, "even if the Ninth Circuit had recognized such a claim, borrowing from

13   Title VII to do so, *see Brown*, 336 F.3d at 1188-93, [plaintiff] has not produced any evidence to

14   show harassment causing a hostile work environment."  *Fowler*, 2008 WL 2383073, at *9.  To

15   establish a hostile work environment, plaintiff would have to establish that he was subjected to

16   verbal or physical conduct of a harassing nature that was based on his disability, the conduct was

17   unwelcome, and the conduct was sufficiently severe or pervasive to alter the conditions of the

18   plaintiff's employment and create an abusive working environment.  Because none of the acts

19   plaintiff alleges are so severe or pervasive to alter the conditions of plaintiff's employment,

20   plaintiff cannot make out a *prima facie* claim of hostile work environment based on his

21   disability.  Further, even if plaintiff could establish a *prima facie* claim, as stated above, he

22   cannot rebut defendant's legitimate, nondiscriminatory and non-retaliatory reasons for its

23   actions.

24        Plaintiff also alleges that, as retaliation, he was assigned additional duties that were not

25   included in the position description for his sedentary job, such as answering phones and driving

26   ////

32

to the front and back gates.[12]  Dep. at 105, 192.  Defendant contends that the court lacks subject matter jurisdiction over this claim because it was not raised in the EEO process.  Dckt. No. 33 at 27.

In order to bring a Rehabilitation Act claim, a plaintiff must first exhaust his administrative remedies, as if he were proceeding under Title VII.  29 U.S.C. §§ 791, 794; 29 C.F.R. § 1614.105; *Greenlaw v. Garrett*, 59 F.3d 994, 997 (9th Cir. 1995).  Under Title VII, a plaintiff must exhaust her administrative remedies by filing a timely charge with the EEOC, or the appropriate state agency, thereby affording the agency an opportunity to investigate the charge.  *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002) (citing 42 U.S.C. § 2000e-5(b)).  "The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and 'narrow[ing] the issues for prompt adjudication and decision.'"  *Id.* (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir.1995) and *Laffey v. N.W. Airlines, Inc.*, 567 F.2d 429, 472 n. 325 (D.C. Cir.1976)).  "Subject matter jurisdiction extends over all allegations of discrimination that either 'fell within the scope of the EEOC's actual investigation or an EEOC investigation which *can reasonably be expected* to grow out of the charge of discrimination.'"  *Id.* (quoting  *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994)); *see also Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir.1990) ("The jurisdictional scope of a Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation.").  Discrete acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  "[Each] retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  *Id.* at 114.

Because plaintiff did not make these allegations during the EEOC process and the

---

[12]  Ironically, even though plaintiff complains that he was on house arrest because he could not go into the industrial yard without escorts, as discussed above, plaintiff also complains that when the escort requirement was lifted, he was required to go into the industrial yard and start taking pictures, which was outside of the sedentary job that he "signed up for."  Dep. at 156.

1    allegations did not fall within the scope of the EEOC investigation, the court lacks jurisdiction to

2    consider them.  As defendant points out, the first time plaintiff raised the issue of "job

3    assignment" was in his complaint in this action, Compl. at 1, and what he meant by it was not

4    made clear until his deposition, Dep. at 105, 192.  Nonetheless, even if the court had subject

5    matter jurisdiction over this claim, the claim still fails because plaintiff has not established that

6    he was assigned these additional duties as a result of engaging in a protected activity, or that the

7    assignment of those duties constituted an adverse employment action.  On the contrary, the

8    duties of plaintiff's sedentary job included: "[r]eceives and answers routine telephone inquires or

9    refers to appropriate staff member" and "[s]ome driving of a government car may be required."

10   Dep., Ex. 2 at 47.

11          Plaintiff further alleges that defendant retaliated against him by failing to convert his

12   wage grade ("WG") position to a general scale ("GS") position, which he contends would have

13   been a promotion.  Dep. at 195-97.  Plaintiff contends that his supervisor's secretary told him

14   that "'[they] would like to transfer [him] to a GS job[,]' [b]ut that never happened."  Dep. at 103-

15   04.  He later states: "Renee Wise [and] Kerr . . . were thinking of [offering me the GS position].

16   They were planning it.  They didn't offer it to me.  They were planning it.  They made me feel

17   optimistic, but they didn't give it to me."  Dep. at 108.  However, these allegations were also not

18   made during the EEOC process and the allegations did not fall within the scope of the EEOC

19   investigation; therefore, the court lacks jurisdiction to consider them.  Nonetheless, even if the

20   court had jurisdiction over this claim, defendant would still be entitled to summary judgment.

21          To make out a *prima facie* case of discrimination for failure to promote under Title VII,

22   plaintiff must show that (1) he belongs to a protected group; (2) he was qualified for and applied

23   for a promotion; (3) he was considered for and denied the promotion; and (4) other employees

24   who were not members of the protected group were indeed promoted at the time plaintiff's

25   request for a promotion was denied.  *See O'Connor*, 517 U.S. at 310; *Texas Dep't of Community*

26   *Affairs*, 450 U.S. at 252.  Plaintiff's allegations that he was not transferred to a GS job, even

1   though his supervisor's secretary told him that he might be, do not establish that he was qualified

2   for and applied for a promotion to a GS position; that he was considered for and denied the

3   promotion; or that other employees who were not members of the protected group were indeed

4   promoted at the time plaintiff's request for a promotion was denied.  *See, e.g., Marshall v.*

5   *Shalala*, 16 F. Supp. 2d 16, 20 (D.D.C. 1998) ("This case concerns allegations of a failure to

6   promote plaintiff to the GS-13 level, not a failure to promote him to a specific position with

7   specific duties. . . . Yet plaintiff never took the steps necessary to 'apply for' a grade increase

8   . . . . Because plaintiff failed to take even the most elementary step necessary by applying for a

9   promotion to the GS-13 level, this Court finds that plaintiff has failed to establish a *prima facie*

10  case of discriminatory non-promotion.").

11          Plaintiff's complaint also alleges that he was retaliated against via "compensation."

12  Compl. at 1.  However, in his deposition, plaintiff clarified that he is referring to compensation

13  for his alleged pain and suffering.  Dep. at 197.  He is not alleging a specific act of retaliation

14  with regard to his employment compensation.[13]  He has presented no evidence to establish that

15  others similarly situated were provided pain and suffering compensation but he was not because

16  of prior protected activity.

17          Finally, plaintiff contends that his exclusion from the Priority Placement Program list

18  amounted to a wrongful termination because his job was being abolished and inclusion on the

19  list would have allowed him to get a transfer and still be working.  Dckt. No. 41-2 at 34.

20  Plaintiff contends that Kerr's "reprimand was . . . kept active to commit an adverse action by

21  defendant to keep [plaintiff] off the 'Priority Placement Program.'"  Dckt. 41 at 2.  Plaintiff

22  contends that his exclusion from the list was retaliation for getting injured on the job.  Dep. at

23  197-99; Pl.'s EEO Aff. ¶ 9.

24

25          [13]  In his opposition, plaintiff contends that "compensation" referred to "Mr. Kerr keeping
    [him] off the Priority Placement Program."  Dckt. No. 41-2 at 34.  However, plaintiff already
26  makes that argument when he contends that he was retaliated via "termination."

1      These allegations also were not made during the EEOC process and did not fall within

2  the scope of the EEOC investigation.  Therefore, the court lacks jurisdiction to consider them.

3  Nonetheless, even if the claims had been exhausted, plaintiff cannot establish a *prima facie* case

4  because plaintiff acknowledges that his job would have been abolished whether or not he had

5  been injured, Dep. at 109, and plaintiff has not rebutted defendant's explanation that plaintiff's

6  exclusion from the Priority Placement Program list was a result of his March 28, 2005

7  disciplinary action (which was discussed above) and the fact that the Priority Placement Program

8  Operations Manual determined plaintiff's ineligibility for the program.[14]  Dep., Ex. 2 at 69-70.

9  *See Yartzoff*, 809 F.2d at 1376-77 (finding that "the EPA met its burden of articulating

10  legitimate, nonretaliatory reasons for its employment decisions regarding [plaintiff by]

11  present[ing] evidence that the transfers of job duties were related to agency reorganization plans,

12  budget cuts, and the inability of staff members to fulfill necessary duties, and that the issuance of

13  the sub-average performance rating for 'cooperativeness was based on incidents allegedly

14  showing that [plaintiff] was uncooperative.").

15      Therefore, defendant is entitled to summary judgment on plaintiff's disability retaliation

16  claims under the Rehabilitation Act.

17  IV.    <u>CONCLUSION</u>

18      In accordance with the foregoing, IT IS RECOMMENDED that defendant's motion for

19  summary judgment be granted.

20      These findings and recommendations are submitted to the United States District Judge

21  assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within ten (10)

22  days after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25

26      [14]  In fact, plaintiff acknowledges that he could not be on the Priority Placement Program list because of his reprimand.  Pl.'s EEO Aff. ¶ 9.

36

shall be served and filed within ten (10) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED:  October 22, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE